UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| KEITH SHANE MACLEOD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 13-188-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JUDE ONUOHA, M.D., *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court has reviewed and considered the motion to dismiss, or in the alternative, for summary judgment [Record No. 25] filed by Defendants Dr. Jorge Vazquez Velazquez, the Regional Physician-Clinical Consultant at the United States Penitentiary ("USP")-McCreary in Pine Knot, Kentucky, and Defendant Dr. Jude Onuoha, the Clinical Director at USP-McCreary. Plaintiff Keith Shane Macleod did not file a timely response to the motion, and the Court denied his subsequent request for an extension of time to file a response. [Record Nos. 30, 34] As explained below, the Court will grant the Defendants' motion for summary judgment regarding Plaintiff Keith Shane Macleod's remaining claims.

I.     **PROCEDURAL HISTORY**

Macleod is currently an inmate confined by the Bureau of Prisons ("BOP") in USP-Hazelton, in Bruceton Mills, West Virginia. In September 2013, while confined in USP-McCreary, Macleod filed this *pro se* civil rights action asserting constitutional claims under 28 U.S.C. § 1331 and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). [Record No. 1] Macleod alleged that between September 2011

and September 2013, he was confined in three different federal prisons, including USP-McCreary, and that officials at each prison were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights.  Macleod also alleged that the Defendants violated his right to due process of law guaranteed by the Fifth Amendment of the United States Constitution.

On April 8, 2014, the Court screened Macleod's Complaint under 28 U.S.C. § 1915A and dismissed a number of his *Bivens* claims against several Defendants.[1]  [Record No. 11] The Court allowed Macleod's individual capacity *Bivens* claims under the Eighth Amendment against Dr. Vazquez Velazquez and Dr. Jude Onuoha to proceed.  [*Id.*]

On August 25, 2014, Dr. Vazquez Velazquez and Dr. Onuoha filed a motion to dismiss or, in the alternative, a motion for summary judgment regarding all remaining counts.  [Record No. 25]  The Defendants attached sworn Declarations documenting the medical treatment rendered to Macleod at USP-McCreary and other BOP facilities; the Declaration of Carlos Martinez, Supervisory Attorney at the BOP's Consolidated Legal Center in Lexington, Kentucky; and voluminous medical records documenting Macleod's medical treatment.  [Record Nos. 25-2–25-11]

Dr. Vazquez Velazquez and Dr. Onuoha contend that: Macleod received prompt, extensive, and appropriate medical treatment at USP-McCreary for all of his medical conditions; Macleod's claims against them consist of merely conclusory allegations; neither

---

1       The Court dismissed claims against Wardens J.C. Holland and Francisco Quintana, for failure to state a claim.  [Record No. 11]  Macleod's negligence claims against Dr. Jude Onuoha were dismissed for lack of subject matter jurisdiction.  [*Id.*]  His claims against Defendant Olga Grajales, Dr. Tidwell, Warden Tamara Jarvis, and Dr. A. Ortiz were dismissed for lack of personal jurisdiction.  [*Id.*]  Finally, claims against Dr. Jude Onuoha and Dr. Vasquez Velazquez in their official capacities were dismissed.  [*Id.*]

of them were sufficiently involved in his medical treatment for any Eighth Amendment liability to attach; and, even assuming Macleod established an Eighth Amendment violation, they are protected by qualified immunity.

In early October 2014, Macleod filed a motion requesting an extension of time to respond to the motion to dismiss, asserting that his confinement in the Segregated Housing Unit ("SHU") of USP-Hazelton precluded access to his legal materials and to the prison law library. [Record No. 27] However, the Defendants submitted sworn statements and other documentation directly contradicted Macleod's claimed restrictions. [Record Nos. 29, 33] After reviewing these materials, the Court found that Macleod had misrepresented material facts regarding his request for an extension of time and denied his motion for an extension and his motion to reconsider the Court's order denying his extension. [Record Nos. 30, 34]

## II.    MACLEOD'S MEDICAL HISTORY AND TREATMENT

### A.    Back and Neck Condition

In June 2011, while confined in USP-Coleman[2] in Coleman, Florida, Macleod complained of severe back and neck pain and on June 11, 2011, and was evaluated utilizing a MRI test. [Record No. 25-4, p. 2, § 3; Record No. 25-2] On August 25, 2011, Macleod was seen by a neurosurgeon to discuss surgical options. [Record No. 25-4, pp. 3–4] The MRI of Macleod's cervical and lumbar spine indicated severe spinal stenosis, cord and exiting left-sided nerve root compression at C5-6 and C6-7 secondary to developmentally shortened pedicles with superimposed left paracentral disc protrusions with no intramedullary edema.

---

2    Dr. Vazquez Velazquez's statement and the Defendants' brief indicates, at times, that Macleod was at USP Victorville during this time frame, but other portions of the record indicate that he was in custody at USP-Coleman. The medical records indicate that these tests occurred while Macleod was at USP-Coleman. [Record No. 25-4, pp. 40–45]

[Record No. 25-4, pp. 3–4]  The USP-Coleman medical staff approved a surgical procedure to address Macleod's back and neck condition and he was provided with prescription medicine for his symptoms.  [*Id*., p. 4]  On October 9, 2011, a "shakedown" of Macleod's cell revealed 45 tablets of Gabapentin that Macleod had not taken as directed.  [Record No. 25-4, p. 5]  Macleod claimed that while he was confined in the SHU of USP-Coleman, three prison officials talked to him and were aware that he had been scheduled to undergo surgery, but that soon thereafter they transferred him to the USP-Victorville in Victorville, California.

Upon arriving at USP-Victorville in 2012, Macleod immediately complained to the medical staff about his pain and informed the medical staff that he had been approved to undergo surgery.  Macleod was evaluated further and, on March 15, 2012, was again approved for a surgical procedure.  [*Id*., p. 6]  However, before Macleod's surgery, he was transferred to the Federal Transfer Center ("FTC")-Oklahoma.  [Record No. 25-4, p. 7]  Macleod claimed that although USP-Victorville officials knew that he was scheduled to undergo surgery, they instead transferred him, or allowed him to be transferred, to FTC-Oklahoma demonstrating deliberate indifference to his medical needs.

On August 7, 2012, just days before he was transferred to USP-McCreary, officials at FTC-Oklahoma discovered that Macleod was rectally hoarding his narcotic pain medication.  [Record Nos. 25-4, p. 8; 25-2,¶ 7]  Macleod was found to have two balloons containing a total of over 100 tablets of narcotic medication stored in his rectum.  [*Id*.]  Because Macleod had been improperly "cheeking" (hoarding or hiding) his pain medication, his narcotic medication was stopped and a medical alert was issued.  [Record No. 25-4, pp. 8, 105]  Macleod was prescribed clonidine for withdrawal.  [*Id*.]  On August 8, 2012, Macleod was

-4-

counseled on the side effects and withdrawal symptoms of clonidine after he complained of fatigue and weakness. [*Id.*, pp. 8, 107–08]

When Macleod was transferred to USP-McCreary on or about August 9, 2012, his medical records were reviewed, he was again examined, and his medications were renewed pending a chronic care clinic appointment. [*Id.*] On August 15, 2012, a Chronic Care encounter was performed. [Record No. 25-4, pp. 112–13] Macleod reported several mental health issues, chronic neck and back pain, and an endo/lipid issue. [*Id.*] The prison medical staff diagnosed three problems: low back pain, brachia neuritis[3] or radiculitis (inflammation of the nerve root), and mental health problems. [*Id.*, pp. 8–9] Macleod was prescribed Amitriptyline, Gabapentin, and Gemfibrozil medications. [*Id.*, p. 9] Following review of the neurosurgery consult on August 25, 2011, staff noted that a neurosurgery consultation was needed because it had been approved at a previous institution. [*Id.*, p. 9] Between late August 2012 and late November 2012, the USP-McCreary medical staff examined, treated, and evaluated Macleod numerous times in response to his complaints of back and neck pain. [*Id.*, pp. 9–12] The medical staff requested a new MRI test and another neurological consultation. [*Id.*, p. 12]

On November 28, 2012, a Chronic Care encounter was performed by Dr. Vazquez Velazquez at Health Services, from which it was again determined that Macleod suffered from low back pain, lumbago, and brachia neuritis or radiculitis. [*Id.*] On December 4, 2012, a consult with a local neurosurgeon was approved and scheduled. On December 6, 2012, Dr. Vazquez Velazquez consulted with Macleod about his neck and back pain, noting

---

3       Brachial neuritis is a disease characterized by pain or loss of function in the nerves that carry signals to and from the brain and spinal cord (the central nervous system) to other parts of the body. [Record No. 25-4, p. 9 n. 23]

that a neurology evaluation was pending at that time.  [*Id*.]  In late December 2012, Macleod requested narcotic pain medication, but was told that no narcotics had been ordered and that he would be re-evaluated at an upcoming chronic care appointment.  [*Id*., p. 13]  On January 14, 2013, Macleod again requested narcotic pain medication, but was told that it was not warranted.  [*Id*.]

 On January 8, 2013, Macleod was seen at the Lake Cumberland Neurological Clinic for his back and neck complaints.  [*Id*.]  The neurologist reviewed the available diagnostic tests but requested updated MRIs before recommending any treatment.  [*Id*.]  The prior MRI results showed that Macleod had degenerative disc disease at the L4-5 and L5-S1.  [Record No. 25-4, p. 13]

On January 16, 2013, Dr. Onuoha performed a consultation encounter at Health Services, and requested a repeat MRI of his cervical and lumber spine to determine if the cervical surgery, which had previously been ordered at another prison, was still warranted. [Record No. 25-4, p. 15; 25-8, p. 3]  On February 20, 2013, Macleod was seen lifting weights in the prison supply closet, using a homemade weight-stick with 5-gallon water jugs hanging from each end.  [Record No. 25-4, p. 17; Record No. 25-5, p. 44]  The following day, Macleod requested narcotic pain medication for pain.  [Record No. 25-4, p. 17]  On January 23, 2013, the prison Utilization Review Committee approved Dr. Onuoha's request for Macleod to be examined by an outside neurologist and radiologist.  [Record No. 25-4, p. 15; 25-8, p. 3]

On March 12, 2013, Macleod came to Health Services in a wheelchair, but told the staff that he lived upstairs and worked out by letting other inmates sit in his wheelchair and pushing them in the chair.  [*Id*.]  On that date, Macleod again requested narcotic pain

medication, but the staff informed him that it was not warranted, and instead prescribed NSAIDs (anti-inflammatory pain medication) for his pain. [*Id.*] On April 1, 2013, Macleod was observed doing push-ups and other exercises. [*Id.*] Macleod again requested narcotic pain medication on April 15, 2013, stating that he was not physically active during his refereeing job or while working on the snow crew. [*Id.*, p. 18]

On May 8, 2013, Macleod had a follow-up neurology consultation. [*Id.*] Because the new MRI results showed degenerative disc disease of the cervical spine, spondylosis, mild bulging in several areas, and cord compression, surgery was scheduled for Macleod's neck condition. [*Id.*] On May 9, 2013, Health Services conducted a consultation encounter with Macleod in preparation for the fusion surgery on his neck, which was scheduled for May 13, 2013. [Record No. 25-8, p. 4] Pre-operation laboratory tests were performed and oxycodone/acetaminophen was prescribed, but the Health Services staff warned Macleod that if he was caught hoarding that medication, it would be discontinued. [*Id.*] Dr. Onuoha reviewed and co-signed the medical encounter and agreed with the prescription plan. [*Id.*]

On May 13, 2013, Macleod underwent cervical fusion surgery at Lake Cumberland Regional Hospital. [Record No. 25-4, p. 19] On May 28, 2013, the neurosurgeon consulted with Macleod, who was happy with the results of the surgery but complained of increased back pain. [*Id.*, p. 20] After reviewing Macleod's lumbar MRI, the neurosurgeon concluded that he had degenerative changes and was not a surgical candidate for back surgery. [*Id.*]

Between June 3, 2013, and April 23, 2014, the USP-McCreary medical staff examined, evaluated, and treated Macleod numerous times in response to his complaints of back and neck pain. [*Id.*, pp. 20–26] On these occasions, the medical staff prescribed various medications (including but not limited to Robaxin) to alleviate his pain, and also

ordered new X-rays.  [*Id*.]  At Dr. Onuoha's request, the Lake Cumberland Regional Hospital staff conducted a second post-surgery evaluation on October 1, 2013, and prescribed Duexis, a drug containing ibuprofen and a histamine blocker that is used to treat osteoarthritis and rheumatoid arthritis.  [*Id*., p. 24]  On October 23, 2013, Macleod reported no pain during a follow-up examination at USP-McCreary's Health Services.  [*Id*.]  On April 23, 2014, during another follow-up examination at Health Services, Macleod stated that he was "doing OK" and that he had no complaints.  [*Id*., p. 26]

**B.  Ankle Injury**

In addition to his complaints of back and neck pain, Macleod alleges that he suffered an ankle injury that required narcotic pain medication and surgery, both of which Dr. Onuoha denied while Macleod was confined in USP-McCreary.  In late July 2012, while confined at FTC-Oklahoma, Macleod alleged that he fell outside of the shower and injured his ankle. [Record No. 25-4, p. 7]  The medical staff at FTC-Oklahoma gave Macleod crutches, administered ibuprofen for the pain, and instructed him to apply ice to his leg to decrease the swelling.  The X-ray results were negative for fracture or other bony abnormality, and his case/splint was removed on August 2, 2012.  [*Id*., pp. 7–8]  On August 9–10, 2012, Macleod was transferred to USP-McCreary,[4] and on August 26, 2012, he requested to be seen for his ankle injury.  [*Id*., p. 9]  Macleod was seen in Health Services on August 30, 2012, for complaints of ankle pain.  [*Id*.]  The medical staff noted decreased range of motion with increased pain in Macleod's left ankle.  [*Id*.]

---

4       Macleod was confined in USP-McCreary from August 9, 2012, to May 14, 2014.  [Record No. 25-2, p. 2, ¶ 3]

In early September 2012, the prison medical staff examined Macleod's ankle, ordered X-rays, the results of which were negative, and provided Macleod with pain medication. [*Id.*, p. 10]  On September 3, 2012, the medical staff authorized Macleod to use a cane until October 3, 2012, and then crutches until December 4, 2012.  [*Id.*]  Additional X-rays taken on September 4, 2012 and October 7, 2012, were negative for fracture and revealed no signs of deformity, edema or laxity, no clicking, crepitus, popping, or locking.  [*Id.*]  Between September 5, 2012, and October 23, 2012, Macleod was seen at least three times for complaints of pain in his left foot and ankle.  [*Id.*, pp. 9–12]  On January 14, 2013, Macleod requested narcotic pain medication for his neck, back, and ankle, but the next day he was told that narcotics were not warranted by the medical staff.  [*Id.*, p. 13]

Dr. Onuoha saw Macleod on January 16, 2013, for complaints of left ankle pain and instability.  [*Id.*, pp. 13–14]  Dr. Onuoha diagnosed a left ankle sprain/strain, prescribed oxycodone/acetaminophen for the ankle pain, and scheduled a psychology consult because Macleod had expressed homicidal thoughts.[5]  [*Id.*, p. 14]  On that same date, Macleod told the prison psychology staff that he was upset because the physician would not prescribe narcotic pain medication.  [*Id.*, p. 15]  The psychology staff recommended relaxation training and prescribed Remeron, an anti-depressant medication.  [*Id.*]

Later on January 16, 2013, Dr. Onuoha conducted a second medical encounter with Macleod, stating that the prison staff had reported that Macleod was actively refereeing basketball games and that he had requested to become a member of the snow crew.  [*Id.*, p. 14]  Macleod acknowledged that he refereed games, but argued that he stood in place while

---

5      The events of January 16, 2013, and of January 18, 2013, discussed *infra*, are also documented in detail Dr. Onuoha's sworn Declaration, [Record No. 25-8, pp. 2-3]

refereeing.  [*Id*.]  Dr. Onuoha states that he told Macleod that the objective tests indicated that he had a normal functioning capacity and did not require narcotic pain medications. [Record No. 25-8, p. 2]  Dr. Onuoha indicated that another MRI would be requested based on medical necessity *after* the prison medical staff received the results of his new left ankle X-ray.  [*Id*.]  Macleod then began complaining about back and neck pain, indicating that he had previously been given morphine for pain.  [*Id*.]  Macleod called Dr. Onuoha incompetent and threatened a lawsuit.  [*Id*.]  Based on his objective findings, Dr. Onuoha discontinued Macleod's oxycodone/acetaminophen medication.  [Record No. 25-8, p. 3]

On January 18, 2013, a report was placed in Macleod's file, stating that on that date, the correctional staff had observed Macleod working on the snow removal detail spreading salt without a cane and moving without difficulty; that they had seen Macleod jogging on the recreation yard; and that Macleod had told a Health Services employee he moved up and down the court while refereeing basketball games.  [Record No. 25-4, p. 15; 25-8, p. 3]  Dr. Onuoha stated that the staff provided this information so that he could assess the medical necessity of Macleod's accommodations/authorization to use a cane.  [Record No. 25-8, p. 3] On January 24, 2013, another X-ray of Macleod's ankle was taken, which again showed negative results for fracture.  [*Id*.]

On February 4, 2013, Macleod was seen at Health Services, stating that he had injured his left ankle and that he heard a popping sound, as if his "foot went out."  [Record No. 25-4, p. 15]  The medical staff found no evidence of crepitus, popping, or trauma, and diagnosed him as suffering from a sprain and/or strain.  [*Id*.]  On February 5, 2013, Health Services again examined Macleod, who complained of left foot pain and requested a wheelchair, which he was issued for three days.  [*Id*.]  The February 6, 2013 X-ray of

Macleod's left ankle was negative for facture but showed a protuberance related to prior trauma.  [*Id.*]

As previously noted, on February 20, 2013, the prison staff had observed Macleod lifting homemade weights consisting of 5-gallon water jugs hanging from the ends of a broom stick, [*see id.*, p. 17], but on March 12, 2013 (less than a month later), Macleod complained to Health Services of back, neck, and left ankle pain, and requested narcotic pain medication until he could undergo a scheduled MRI.  [*Id.*]  Because Macleod indicated that he could go up and down stairs, could referee basketball games, and was working on the snow crew, he was denied narcotic pain medications.  [*Id.*]  On April 1, 2013, Macleod was observed doing push-ups and other exercises in his cell and in a stairwell.  [*Id.*]

On June 13, 2013, Macleod's ankle was noted as improving and he was observed to have a steady gait.  [Record No. 25-4, p. 21]  On July 24, 2013, Macleod failed to appear for a scheduled appointment to evaluate his ankle pain.  [*Id.*]  On August 8, 2013, the medical staff requested an MRI, a radiology consultation, and a follow-up with the neurosurgeon for Macleod's ankle, but noted that Macleod "kept adding new complaints once an issue is resolved prolonging his visit from 15-20 minutes to 50 minutes."  [*Id.*]

On November 5, 2013, an MRI of the ankle revealed a fairly extensive ganglion cyst[6] and a tendonitis-type of irritation of his foot.  The administrative notes from the encounter on November 21, 2013, reflect that Macleod had already been prescribed NSAIDs, and that an ankle brace was provided at his request.  [*Id.*, p. 25]  Health Services examined Macleod again on December 18, 2013, in response to his complaints of ankle pain, and prescribed

---

6    A ganglion cyst is a tumor or swelling on top of a joint or the covering of a tendon (tissue that connects muscle to bone).  [*Id.*, p. 25, n.40]

Methylprednisolone, a steroid that prevents inflammation.   Medical staff also instructed
Macleod to apply heat or ice to his ankle, and to wear the ankle brace.  [*Id.*, pp. 25–26]

Dr. Onuoha states that his direct, personal involvement in Macleod's healthcare was
limited to:  (i) actual encounters with Macleod on January 16, 2013; (ii) review of the
January 18, 2013, staff memorandum documenting Macleod's various physical activities;
(iii) review and approval of Macleod's January 18, 2013, medical encounter and prescription
plan, and a recommendation on that date that Macleod be examined by an outside neurologist
and radiologist; and (iv) review and approval of Macleod's pre-op surgical plan on May 9,
2013.  [*Id.*]  Dr. Onuoha began his service as the Clinical Director at USP-McCreary on July
14, 2013, almost a year after Macleod arrived at the prison.  Both before and after July 14,
2013, Macleod was primarily treated at the prison by the Primary Care Provider Team
("PCPT"), which was responsible for developing and providing direct patient care.  [Record
No. 25-8, pp. 6–7]

Dr. Vazquez Velazquez states that, as the Regional Physician-Clinical Consultant, he
was not the primary provider of Macleod's medical treatment, and that he had limited contact
with Macleod while he was confined in USP-McCreary.  [*Id.*, p. 28]  Dr. Vazquez Velazquez
and Dr. Onuoha assisted in providing necessary medical care for all of Macleod's alleged
conditions, reviewed and approved the recommendations of the PCPT and the specialist
neurosurgeon.  They assert that they followed all applicable BOP policies regarding prisoner
medical treatment.  The Defendants note that Macleod received extensive medical care for
his various alleged conditions, consisting of numerous examinations and evaluations within
Health Services, surgery on his neck (C-Spine), X-rays, referrals to and consultations with

-12-

outside specialists, MRI tests, the provision of medical appliances, and a host of medications. [*Id.*, pp. 26-27]

Drs. Vazquez Velazquez and Onuoha assert that neither they nor anyone else on the USP-McCreary medical staff was deliberately indifferent to Macleod's serious medical needs.  The Defendants contend that conservative and cautious use of narcotic pain medication to treat Macleod's alleged back, neck, and ankle pain was warranted based on Macleod's inconsistent medical history about the cause of his injuries; his documented abuse of narcotic pain medication; the lack of objectively observable symptoms; and the fact that at the same time Macleod was requesting narcotic pain medication, the prison staff had observed him engaging in various physical activities, such as jogging, weight lifting, body conditioning, refereeing basketball games, and working on a snow removal crew.  [Record Nos. 25-4, p. 27; 25-8, p. 7]  As for Macleod's ankle injury, Dr. Onuoha asserts that although all of the X-rays were negative for fracture, both he and the prison medical staff properly examined, monitored, evaluated, and treated Macleod's ankle condition, and provided him with all necessary medications and medical appliances.  [Record Nos. 25-4, p. 27; 25-8, pp. 7–8]

## III.    THE SUMMARY JUDGMENT STANDARD

Because the Defendants have submitted sworn declarations and other materials outside of the pleadings, the Court will treat their arguments under Rule 56 of the Federal Rules of Civil Procedure.  *See Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993); *Smith v. The Cheesecake Factory Rests., Inc.*, No. 3:06-00829, 2010 WL 441562, at *3–4 (M.D. Tenn. Feb. 4, 2010) (citations omitted) ("[I]f affidavits are filed with the district

court, the court must proceed under Rule 56 unless the court decides to exclude the affidavits.").

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). Drawing all reasonable inferences in favor of the nonmoving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Macleod did not file a timely response to the Defendants' motion to dismiss, and was twice denied an extension of time in which to do so. When faced with an unopposed motion for summary judgment, however, a district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met his burden. *Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 380–81 (6th Cir. 2011) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.") (quoting *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991)). The Court will thus examine the record to determine if the Defendants have carried their burden of proof.

## IV.    ANALYSIS AND DISCUSSION

In his Complaint, Macleod alleges that as to both his cervical and lumbar conditions, Dr. Vazquez Velazquez needlessly delayed ordering cervical fusion surgery and then later

-14-

refused to authorize additional surgery, causing those conditions to deteriorate.  He also claims that Dr. Vazquez Velazquez's actions, or inactions, amounted to deliberate indifference to his serious medical needs, thus violating his Eighth Amendment right to be free from cruel and unusual punishment.  Macleod asserts the same Eighth Amendment claim against Dr. Onuoha, challenging the decisions which he made with respect to treating his ankle condition, including his decision to withhold narcotic pain medication.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's objectively serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A deliberate indifference claim has two components, one objective and the other subjective.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"  *Comstock*, 273 F.3d at 703.  Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Id.*

Assuming Macleod's back/neck problems *and* his ankle conditions qualify as objectively serious medical conditions, his Eighth Amendment claims against both Defendants fail because he has not satisfied the subjective prong of the *Farmer* test.  The subjective component can be satisfied by showing that the prison official was deliberately indifferent to a prisoner's serious medical needs, such as by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle*, 429 U.S. at 104; *see Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).

-15-

The Defendants' Declarations and attached medical documents, which number several hundred pages, reveal that they did not deny or delay providing Macleod with necessary medical care, nor did they intentionally interfere within any treatment once prescribed.  Indeed, the USP-McCreary medical staff, with the limited participation of both Defendants, promptly assessed Macleod's medical conditions in August 2012; examined and evaluated him on numerous occasions during the next two years; ran numerous costly laboratory and diagnostic tests, including but not limited to a series of MRIs and X-rays of his back, neck, and ankle; referred him to outside specialists in January 2013 to determine if cervical fusion surgery was still appropriate; ensured that he did *in fact* undergo cervical fusion surgery in May 2013; ensured that he received all necessary post-surgery follow-up at both the hospital and at the prison's Health Services; repeatedly reviewed all of his diagnostic tests to determine if he was a candidate for further cervical/lumbar surgery or any surgery on his ankle; responded to his complaints of pain and provided him with numerous medications; and provided him with a wheelchair, crutches, and an ankle brace.

Such ongoing and responsive medical treatment is the antithesis of deliberate indifference.  *Brooks v. Celeste*, 39 F.3d 125, 128–29 (6th Cir. 1994); *Lara-Portela v. Stine*, No. 07-CV-014-KKC, 2008 WL 45398, at *7–9 (E.D. Ky. Jan. 2, 2008).  The overall record reflects that the USP-McCreary medical staff and the Defendants were highly solicitous of Macleod's medical needs and made substantial efforts to ensure his well-being.  The record provided by the Defendants also reveals that Macleod's extensive medical care met or exceeded that which he would have received in a non-prison setting.

Macleod claims that he deserved more aggressive treatment (*i.e.*, more surgical procedures and narcotic pain medications) than he received, but his claims amount to nothing

more than a difference of opinion with his doctors regarding the nature and extent of medical treatment and/or choices of medication.  Disputes of that kind do not rise to the level of an Eighth Amendment violation.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see also Clark v. Corr. Corp. of Am.*, 98 F. App'x 413, 416 (6th Cir. 2004); *Simpson v. Ameji*, 57 F. App'x 238, 239 (6th Cir. 2003).

As Dr. Vazquez Velazquez and Dr. Onuoha explain, after Macleod was transferred to USP-McCreary, it was necessary to medically reassess whether he was still a candidate for cervical spine surgery, due to the passage of time since Macleod was initially approved at another facility.  Further, the surgeon also required updated testing for his own purposes.  Macleod's allegation that Drs. Vazquez Velazquez and Onuoha unreasonably delayed in scheduling his cervical surgery until May 2013 is simply unwarranted in light of the medical history that the Defendants have provided.  *See Davis v. Caruso*, No. 07-10115, 2008 WL 540818, at *7 (E.D. Mich. Feb. 25, 2008) (any initial delays in diagnosing or treating fractured finger failed to reveal deliberate indifference) (collecting similar cases); *O'Bryan v. Fed. Bureau of Prisons*, No. 6:07-76-DCR, 2007 WL 2571906 (E.D. Ky.  Sept. 4, 2007) (finding five-month delay between broken wrist injury and consultation with surgeon did not show deliberate indifference); *Bierbauer v. Manenti*, No. 4:09CV2142, 2010 WL 4008835, at *6 (N.D. Ohio Oct. 12, 2010) (delay in hip replacement surgery did not amount to deliberate indifference.)  Simply put, Macleod was not entitled to the equivalent of "on demand," or "drive-through," medical treatment according to his schedule.

-17-

Further, the Defendants' conclusion that *additional* cervical or lumbar surgery was not medically necessary was based on two central considerations, the first being that no surgeon or other healthcare provider recommended surgery for Macleod's lumbar spine or additional surgery on his neck.  The records indicate that his first cervical surgery was successful.  As both Defendants further explain, the decision not to authorize surgery on Macleod's ankle stemmed from the fact that the ankle was not fractured, and based upon their professional opinion, his subjective pain complaints could be adequately managed by more conservative measures.  And in fact, that conservative treatment was successful.  On September 27, 2013, the prison medical staff determined that Macleod had a full range of motion in his neck and extremities.  On October 1, 2013, Macleod reported being pleased with his the results of his surgery.  Further, the medical notations from the April 23, 2014, encounter at USP-McCreary document that Macleod was "doing OK," and that he had no complaints.  [Record No. 25-4, p. 26]

The second consideration (*i.e.*, that Macleod's personal conduct was inconsistent with pursuing more aggressive medical treatment) also supports the defendant's determinations. In early 2013, the prison staff observed Macleod working on the snow crew and spreading salt without problem, lifting home-made weights to which five-gallon water jugs were attached, refereeing basketball games, and jogging.  Further, Macleod told the USP-McCreary medical staff that he pushed other inmates around in the wheelchair — which the prison had issued to him — to improve his body conditioning.  Such strenuous physical exertions hardly justified either additional procedures or the dispensation of narcotic medications, which Macleod relentlessly demanded.

-18-

Macleod disagrees with the Defendants' professional judgment on these issues, but federal courts generally refuse to intervene in questions of medical judgment, *Flick v. Vadlamudi*, No. 1:09-CV-647, 2010 WL 3884508, at *22 (W. D. Mich. Aug. 9, 2010), and are hesitant to second-guess professional judgments exercised by medical professionals. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014); *Rhinehart v. Scutt*, 509 F. App'x 510, 514 (6th Cir. 2013). The Defendants' decisions concerning Macleod's medical treatment simply do not suggest cruel and unusual punishment.

Further, federal courts have also consistently held that a medical provider has not been deliberately indifferent to a prisoner's medical needs when he or she decides to withhold a certain medication based on "medical judgment" and "reasonable concern about providing narcotics to jail inmates." *See, e.g.*, *Williams v. Rodriguez*, No. 10-2715, 2012 WL 1194160, at *10 (N. D. Cal. Apr. 10, 2012) ("Though plaintiff would have preferred morphine, a difference of medical opinion is not sufficient by itself to make out a violation of the Eighth Amendment."); *Todd v. Bigelow*, No. 09-CV-808, 2012 WL 627965, at *6 (D. Utah Feb. 24, 2012) (finding no deliberate indifference when inmate was offered other, alternative pain medications); *Shockley v. Fox*, 444 F. App'x 36, 38 (5th Cir. 2011) (rejecting prisoner's claim that the prison medical staff's refusal to administer narcotic pain medication violated his Eighth Amendment rights); *Cutler v. Corr. Med. Servs.*, No. 3:08-CV-00507-BLW, 2011 WL 4479025, at *9–10 (D. Idaho Sept. 26, 2011) (same); *Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006) (same).

In refusing to continue Macleod's narcotic medication, both Defendants reasonably considered the fact that in August 2012, just days before Macleod was transferred to USP-McCreary, the staff at FTC-Oklahoma discovered that he was hoarding over 100 morphine

pills in his rectum.  In addition to that episode, BOP attorney Carolos Martinez states that in March 2011, Macleod was charged with and convicted of violating BOP Code No. 113, *Possession of Narcotics*; his punishment was the loss of 14 days of good time credits, 30 days in disciplinary segregation, and the loss of various institutional privileges.  [Record No. 25-2, pp. 13–14]  Martinez also listed other instances from 2012, in which Macleod was charged with and convicted of improperly possessing drug substances in violation of BOP regulations.  [*Id*., pp. 14–17]  Based on that relevant information, the Defendants reasonably concluded that Macleod did not need to continue taking narcotic medication, and that his subjective complaints of pain could be effectively treated without it.  The Defendants did not terminate Macleod's narcotic medication without either examining him or reviewing his medical history.  Instead, Dr. Onuoha made that decision based on lack of objective findings after examining Macleod, and after reviewing Macleod's medical history.

Courts have consistently determined that prison medical doctors have not been deliberately indifferent to a prisoner's medical needs by terminating certain medications after discovering that the prisoner has been "cheeking," stowing, or otherwise abusing their prescribed medications.  *See, e.g., Reed v. Sapp*, 211 F.3d 1270, 2000 WL 571994 (6th Cir. May 5, 2000) (unpublished table opinion) (finding that defendants were not deliberately indifferent to prisoner's medical needs where the prisoner had salvaged his pain medication for prohibited use); *Todd*, 2012 WL 627965, at *6 (finding no deliberate indifference where inmate's medication was discontinued in light of the "cheeking" incident); *Atakpu v. Lawson*, No. 1:05-cv-524, 2008 WL 5233467, at *11 (S.D. Ohio Dec. 11, 2008) (same).[7]

---

[7]     *See also Shea v. Wheeler*, No. 00-72, 2001 WL 34376846, at *6 (W.D. Wis. June 19, 2001) (same); *Aquino v. Girdich*, No. 04-CV-87, 2007 WL 201170, at *5 (N.D. N.Y. Jan. 23, 2007) (finding no

The decision to terminate Macleod's narcotic medication was fully warranted based on his documented history, which included rectally hoarding pain medication.  Even in the absence of such overwhelming justification, the decision to discontinue Macleod's narcotic medication would have been, if anything, a claim for professional malpractice or negligence. A prisoner's dispute with the adequacy of the extensive medical treatment amounts to no more than a medical malpractice claim which is not cognizable under the Eighth Amendment.  *See Estelle*, 429 U.S. at 106; *Hill v. Jones*, No. 98-5100, 2000 WL 571948, at *3 (6th Cir. May 3, 2000) ("[A] disagreement between medical personnel over the appropriate course of treatment is insufficient to establish an Eighth Amendment claim."); *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("[M]alpractice does not violate the Eighth Amendment; instead the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition.")  Thus, with respect to the decision to terminate his narcotic pain medication, Macleod has not asserted a valid Eighth Amendment deliberate indifference claim.  *See Starling v. United States*, 664 F. Supp. 2d 558, 570 (D.S.C. 2009); *Smith v. United States*, No. 06-139 Erie, 2007 WL 2155703, at *6 (W.D. Pa. 2007).

In summary, Macleod has not supported his broad Eighth Amendment claims. Macleod's deliberate indifference claims are based solely on his interpretation of medical records and his own lay opinion about his various alleged conditions and medication needs.

---

deliberate indifference where medication was discontinued after inmate was found to be misusing medicine); *Johnson v. Herman*, No. 1:05-CV-372, 2006 WL 1408389, at *2–3 (N.D. Ind. May 18, 2006) (same); *Jones v. Ehlert*, 704 F. Supp. 885, 888–89 (E.D. Wis. 1989) (same); *Percival v. Kelso*, No. 09-CV-1699, 2011 WL 794419, at *6 (E.D. Cal. March 1, 2011) (finding no deliberate indifference when medication was discontinued after inmate was found selling medicine to other inmates).

His Eighth Amendment claims amount to nothing more than a disagreement regarding the adequacy and sufficiency of his medical treatment.  The undisputed facts do not support a claim alleging deliberate indifference in violation of the Eighth Amendment.

Dr. Vazquez Velazquez, Dr. Onuoha, and the entire USP-McCreary medical staff consistently responded to Macleod's medical needs, treated him, administered a variety of medications to address his pain complaints, provided surgical intervention, and referred Macleod to outside specialists for evaluation and follow-up care.  The fact that the medications and treatment Macleod received were not the type he preferred does not translate into an Eighth Amendment violation.  The Defendants have amply refuted Macleod's allegation that they failed to adequately and promptly treat his various medical problems.  Accordingly, there are no material issues of relevant fact to be determined.  And because no constitutional violations occurred, issues regarding qualified immunity need not be addressed.

## V.      CONCLUSION

Based on the foregoing analysis and discussion, it is hereby **ORDERED** as follows:

1.      The motion to dismiss or, in the alternative, for summary judgment filed by Defendants Dr. Jorge Vazquez Velazquez and Dr. Jude Onuoha [Record No. 25] is **GRANTED**.

2.      The Court will enter an appropriate Judgment this date.

3.      This civil action is **DISMISSED** and **STRICKEN** from the Court's docket.

This 13th day of February, 2015.



Signed By:

*Danny C. Reeves*

United States District Judge